UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-cr-00244-MOC-DSC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Vs. | ) | MEMORANDUM OF DECISION |
| | ) | AND VERDICT |
| | ) | |
| MICHAEL KIPP | ) | |
| JOANNE VIARD, | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** came before the Court after a bench trial. Prior to conducting the bench trial, the Court conducted an inquiry under Rule 23, Federal Rules of Criminal Procedure, during which it made inquiry of defendants and determined that their waivers of a jury trial were knowing, willful, and voluntary. Under the second prong of Rule 23, the government also consented to a bench trial. The Court then determined under the gatekeeper function of Rule 23 that a bench trial would be conditionally allowed. Trial commenced February 21, 2017 and concluded March 13, 2017. Thereafter, the parties timely submitted their post-trial briefs (#s 167, 168, & 169).

FINDINGS AND CONCLUSIONS

## I. Background

In 2015, defendants Michael Kipp and Joanne Viard were charged in the multiple count Indictment (#1) with offenses stemming from an accounting fraud scheme, the object of which was to have Swisher Hygiene Inc. ("Swisher") meet management's earnings projections each quarter not necessarily through actual sales of goods and services, but through manipulation of accounting entries. Swisher, which had been a closely held family-owned company for decades, had recently

-1-

been acquired and became a publicly traded company headquartered in Charlotte, North Carolina. As the Court saw during the three weeks of trial, the actions of these defendants and others in attempting to manipulate the books and records of Swisher once discovered compelled Swisher to restate its earnings in 2012, which ultimately led to the demise of Swisher.

Defendant Michael Kipp ("Kipp") is a certified public accountant ("CPA") and served as Swisher's Chief Financial Officer ("CFO") from 2011 until early 2012. Defendant Joanne Viard ("Viard") is also a CPA and was employed during relevant times as Swisher's Director of External Reporting. While not a member of "senior management," the evidence showed that Viard in her capacity as Director of External Reporting served both Swisher and the investing public in a gatekeeping role as she was responsible for ensuring that Swisher filed fair and materially accurate financial statements with the Securities and Exchange Commission ("SEC"). After the controller Hugh Crawford ("Crawford") was fired in early 2012 and the accounting scheme began to unravel, Viard was promoted by Kipp to the controller of Swisher.

After Crawford was fired, he disclosed the accounting scheme to Swisher's outside auditors BDO. The outside auditors investigated his claims and, satisfied that the financial reports had been manipulated, reported the scheme to Swisher's internal audit committee. Such internal investigations led Swisher to restate its earnings for 2011 and defendants' employment was terminated. After the restatement, Swisher's stock declined and what remained of the company was purchased by another sanitation supply company.

## II.    The Indictment

The Indictment charges in Count I that from on or about 2011 through in or about 2012, in Mecklenburg County and elsewhere, defendants engaged in a conspiracy to commit securities fraud, to make false and/or misleading statements to Swisher's auditors and accountants, and to falsify the

books, records, and accounts of Swisher. Indictment (#1) at 15. In Counts II and III, defendants are also charged with participating in a wire fraud scheme (Count II) and committing securities fraud (Count III) throughout the same time period. <u>Id.</u> at 17-18. Kipp is charged individually with committing bank fraud. Count IV, <u>id.</u> at 19.

In addition, Kipp was charged in Count V and Viard was charged in Count VI with misleading conduct to hinder an investigation. <u>Id.</u> at 20–21. Upon motion of the defendants made in accordance with Rule 29, Federal Rules of Criminal Procedure, Counts V and VI were dismissed at the close of the government's case.

## III. Standard Applicable to Bench Trials

When a case is tried without a jury, Rule 23(c) provides that the court "must find the defendant guilty or not guilty." Fed.R.Crim.P. 23(c). The Rule goes on to provide that "[i]f a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." Fed.R.Crim.P. 23(c). Here, the parties have asked the Court to make its specific findings in writing and, after such writing is complete, to enter its Verdict in open court and then file its Memorandum of Decision.

In a bench trial, the court's duty is to find the facts, weigh the evidence, and choose from among conflicting inferences and conclusions those which the court considers most reasonable. <u>Penn–Texas Corp. v. Morse</u>, 242 F.2d 243, 247 (7th Cir. 1957); <u>Latimer v. Washington Gas Light Co.</u>, 2012 WL 2119254 (E.D.Va. 2012). Sitting as the finder of fact, a trial court may disregard testimony of any witness when satisfied that the witness is not telling the truth, or the testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. <u>Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.</u>, 56 F.3d 556, 567 (4th Cir. 1995). It is the duty of the trial judge sitting without a jury to appraise the testimony and demeanor of witnesses. <u>Burgess v. Farrell Lines, Inc.</u>,

335 F.2d 885, 889 (4th Cir. 1964). In the end, Rule 23(c) requires that a judge sitting without a jury must do more than announce statements of ultimate fact. United States ex rel. Belcon, Inc. v. Sherman Constr. Co., 800 F.2d 1321, 1324 (4th Cir. 1986) (applying bench trial standard in civil context). The court must support its rulings by referencing the facts on which it relies. Id. In the end, this Court must be convinced of a defendant's guilt beyond a reasonable doubt based on all the evidence presented.

## IV. Discussion of the Facts

Mindful of the Court's duty under Rule 23(c) when it is also the trier of fact, the discussion that follows is intended to highlight the evidence that informed the Court's Verdict. It is not intended to be an unabridged recounting of all the evidence presented, which is found in the record and covers thousands of pages.

### A. The Nature of the Scheme

While it took the better part of three weeks to try, the scheme was not an elaborate one: after the close of each quarters two, three, and four and annually for 2011, Swisher would meet adjusted EBITDA[1] regardless of actual earnings through "earnings management." Defendants successfully executed the scheme through the second and third quarters of 2011 resulting in false quarterly statements for those periods. While attempting to manipulate the results for the fourth quarter, defendant's scheme was uncovered, preventing them from filing a false report for the fourth quarter and for the 2011 year end. While defendants argued that the fourth quarter conduct should not be considered as it did not find its way to the fourth-quarter report, the Court finds such conduct

---

[1] "EBITDA is a commonly used measure of a company's ability to produce income on its operations in a given year. It is shorthand for earnings before interest, taxes, depreciation, and amortization." *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 352 (Bankr. E.D. Va. 2016), aff'd sub nom. *United Mine Workers of Am. 1974 Pension Plan & Trust v. Alpha Nat. Res., Inc.*, 553 B.R. 556 (E.D. Va. 2016) (*citing* David L. Scott, *Wall Street Words: An A to Z Guide to Investment Terms for Today's Investor* (3d. ed.2003)).

relevant in its consideration of totality of the evidence in the case as it amounts to "attempted conduct" in furtherance of both the conspiracy and the underlying fraud charges.[2]

Just like balancing the checkbook at home, the purpose of a "financial close process" both quarterly and at the end of the fiscal year for a publicly traded corporation is to present fair and accurate financial statements to the end users, which in this case were the investing public and lenders.[3] The totality of the evidence presented convinced the Court that earnings management resulted in materially misleading and/or false financial statements for the second and third quarters of 2011.[4] These misstatements were particularly harmful as they found their way into Swisher's Q2 and Q3 10-Q filings with the SEC and were made available to the investing public and its lender, Wells Fargo.[5]

There can be no doubt that adjusted EBITDA was an important number, both at Swisher and to those who received its reported financials.[6] In their public filings, Swisher made clear that it reported adjusted EBITDA "because we consider it an important supplemental measure of our operating performance and believe it is frequently used by securities analysts, investors and other interested parties in the evaluation of our results." Swisher also repeated these false financial results, and in particular, its adjusted EBITDA, in press releases and during earnings calls.[7]

The earnings management scheme followed the same pattern each quarter: Kipp would send a previously determined adjusted EBITDA target to the accounting department; Kipp and Viard would then direct the booking of entries to get to the previously established earnings targets; and if

---

2       For example, s*ee* 18 U.S.C. § 1344 (in the context of bank fraud, making unlawful "attempts"). The Court leaves open the issue of how attempted conduct impacts sentencing under U.S.S.G. § 2F1.1.
3       Tr. 81, 82–83, 211 [Crawford].
4       Tr. 86, 94, 139, 219 [Crawford], 714-20, 732-33, 838 [Pierrard], 1184-85, 1200 [Berry], 3340-41, 3349, [Kelly], 3618-19 [Jennnings].
5       GX 59 p.46, 145, p.30; Tr. 1832-33 [Wittman].
6       Tr. 187 [Crawford], 762 [Pierrard], 1834, 1837 [Wittman].
7       GX 58, 60, 60a 146, 146a, 148b.

someone found a "bad guy," i.e., an expense, they were expected to find a "good guy" to negate or "offset" that negative hit to earnings.[8] This quarterly process would only end when the accounting department made enough entries to hit the predetermined target – at that point, Kipp would announce that the closing process was concluded.[9] While defendants argued that this conduct was not fraud, even defendants' experts opined that indicators of fraud include (1) entries made late in the closing process, (2) changes in numbers after they were first compiled and consolidated in the corporate office, and (3) entries made after the numbers were first consolidated that almost always increased income.[10] As their experts put it, one place to look for fraud is the quarter-end or year-end journal entries that may reveal patterns of reserve manipulation, reserve enhancement, or other peculiar activity taking place as each financial period draws to a close, because unusual manual entries, potentially the result of senior executive directives, may surface.[11] All of these fraud indicators are present here.

Moreover, defendants' own experts testified that the accounting areas utilized by defendants to inflate Swisher's earnings were "common areas" for fraud. For example, both defense experts testified[12] that earnings management is most likely to occur in areas of the financial statements that involve flexibility or the use of judgment, or that involve exploiting potential ambiguities in Generally Accepted Accounting Principles ("GAAP").[13] Those common accounting fraud areas

---

8    GX 27, 85, 193; Tr. 138, 202 [Crawford], 560 [Robinson], 740 [Pierrard].
9    GX 219.
10   Tr. 3338-40, 3404-08 [Kelly]; 3602, 3612 [Jennings].
11   Tr. 3354-55 [Kelly]; see also Tr. 3614 [Jennings].
12   Tr. 3348-49 [Kelly]; 3609 [Jennings].
13   As the Supreme Court has noted,

     GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be. Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time. GAAP changes and, even at any one point, is often indeterminate. The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles.

include reserves, bad faith estimates and one-time charges, expenses (in particular improper capitalization of expenses), and acquisition accounting. And these are the same areas where defendants went when engaging in the fraudulent scheme here.[14] For example, when falling short of their target, the testimony and exhibits revealed that defendants fraudulently manipulated: (1) acquisition accounting, taking expenses that were supposed to be booked to the P&L and moving them to the balance sheet, (i.e., Lee County and Cascione entries); (2) contingent earn-outs set up as part of acquisitions, (i.e., the "Enviro Earnout"); (3) other reserves (i.e., bad debt and Choice worker's compensation reserves); and (4) other expenses, particularly by capitalizing expenses. In each instance, Defendants' entries reduced expenses and increased earnings, enabling Defendants to fraudulently reach their earnings target.

### B. Second Quarter Reporting

As to 2011 second quarter reporting, the evidence presented made it clear that $3M was the target and Kipp made it clear to Swisher's accounting department that it would be their job to get Swisher to that number.[15]

Of particular note at trial was the testimony of John Pierrard ("Pierrard") an accountant in Swisher's accounting department. Pierrard worked as director of accounting and directly reported to Kipp. On direct, Pierrard admitted his participation in an accounting fraud conspiracy and pled to a Bill of Information.[16] While it was clear that Pierrard's testimony was in exchange for

---

*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (citation omitted). The Supreme Court further recognized that although financial accounting is a "process that involves continuous judgments and estimates," it nevertheless has "as its foundation the principle of conservatism, with its corollary that possible errors in measurement should be in the direction of understatement rather than overstatement of net income and net assets." *Id.* at 100 (citation omitted).

14      Tr. 3349-51 [Kelly]; 3615-21 [Jennings].
15      Tr. 741-42, 745, 748 [Pierrard].
16      The Court notes that while Pierrard testified that he believed he was engaged in an accounting fraud scheme, the ultimate determination of whether any scheme, conspiracy, or fraud is for the Court to decide based on all the evidence.

concessions made in plea negotiations, the Court found his testimony to be credible. Generally, he testified that the scrubbing of numbers for mistakes in closing process was proper, but that it was not appropriate to seek out only positive entries because it could produce an inaccurate financial statement. He testified that the goal of quarterly closing should not be to book to a target number, but only to provide accurate entries and that such was a basic principle. He testified that after what should have been the close date, Kipp instructed him to scrub the numbers to find entries to meet the target and that the quarter would not close until that target was met. He stated that along with himself, Viard, Kipp, and others were involved in the scheme.

Pierrard stated that the numbers presented at the close of the quarter were not accurate. Under the scheme, the accounting department would find bad guys, take them to Kipp, and Kipp would tell them what to do, such as order a reversal. He testified that an accountant should not offset a found expense, as that's not the role of accountants. He testified that on July 23, 2011, Kipp expected earnings to change by $600,000 for the second quarter. He also testified that Viard sent an email that day that she found a $176,000 "bad guy" that would put Swisher below the $3,000,000 target for Q2, and was looking for offset. He testified that Kipp told him to go to Cooper to come up with a capitalization policy for this expense, all to help EBITDA. Pierrard testified that Kipp said if we are short we will get it in bad debt. The evidence showed that 20% of Swisher's reported adjusted EBITDA for Q2 came from accounting entries, such as those testified to by Pierrard, booked in a single day twenty-five days after Q2 closed.[17]

The Court finds that at least three of the Q2 entries were made for a fraudulent purpose and also fraudulent in and of themselves: (1) the Nick Cascione ("Cascione") severance expense reversal; (2) Lee County contract entry; and (3) the second bad debt entry.

---

17      GX 38, 41, 59; Tr. 695-96 [Eichstadt], 745, 760-61 [Pierrard].

### 1. The Cascione Expense Reversal

The evidence showed that the Cascione expense reversal was improper as accounting rules provide guidance as to when to recognize severance expenses associated with business combinations. Factors include the timing of when the severance was entered into (i.e. was it in place at the time of the business combination), how long the employee worked after the combination (i.e. not more than 60 days), whether it was communicated to the employee, and who received the benefit of the employee's services.[18] Applying these factors, it is clear it was improper to purchase account Cascione's salary as there was no severance deal in place at the time of the Choice acquisition,[19] the purported severance was not communicated to Cascione,[20] he worked at Swisher for more than 60 days following the acquisition,[21] and Swisher received the benefit of Cascione's services.[22] Viard's accounting expert, William Jennings ("Jennings"), conceded that it mattered what actually happened, and if Cascione was doing work that generated revenue for the company, his salary should be booked as an expense in the period he did that work.[23]

Based on all the evidence, the Court finds that Cascione worked for the company until at least sometime in June 2011[24] and it was improper to remove such compensation from expense.[25] Thus, when defendants took Cascione's salary out of the expense category, they falsely represented that the entry was appropriate and falsely justified that decision based on a severance agreement being in place at the time of the acquisition, which there was not.[26] The evidence showed that

---

18      Tr. 1123-27 [Berry]; see also Tr. 3359-60 [Kelly].
19      GX 57; Tr. 1071-72 [Cascione].
20      Tr. 1068, 1076 [Cascione].
21      GX 28, 57; Tr. 1066-68, 1077].
22      Tr. 1006, 1073 [Cascione].
23      Tr. 3662-63 [Jennings].
24      GX 28; Tr. 1066-68, 1077 [Cascione].
25      GX 28; Tr. 3662-63 [Jennings], 1133-34 [Berry].
26      GX 30; 44; 55a, GX 54, p.55.

defendants well knew, prior to the filing of the 10-Q incorporating the fraudulent Cascione entry that this entry and their justification were false.[27] Not only was the entry and its justification false, the Court is convinced that defendants well knew the entry was false when made as its sole purpose was to fraudulently inflate Swisher's Q2 earnings to hit the $3m target.[28] The Court found no merit in defendants' argument that the Cascione entry was appropriate because his employment contract was unfavorable months after the entry was made. Rather, the Court found Mr. Cascione's testimony to be compelling: first, that he "was a garbage man, not an accountant;" he was paid cash for his 10% interest in Choice rather than receive Swisher stock; he expected to be paid his salary through November 30, 2012; and that it was made clear to him in the summer of 2011 that if Swisher called, he be obligated to come back to work. He further testified that he never talked with Kipp.

## 2. The Lee County Contract Expense Reversal

The Lee County contract expense reversal was also improper. The evidence presented showed that to determine if a contract is unfavorable, the contract is compared to the typical market participant, which requires looking at the conditions present at the time the contract was entered into, including whether it was with a related party, whether it was attained in a competitive bid process, and how recently was it awarded.[29] To her credit, Viard was initially troubled by this proposed reversals sought advice from an outside consultant, Chris Cothran ("Cothran"). She stated that she was concerned about booking this entry and was "getting a lot of pressure" to record it.[30]

Cothran testified that he worked as an accountant in Florida and that he had provided services to Swisher. He testified that when Viard contacted him, she told him that she was under pressure to record the Lee County waste contract as an unfavorable contract. He stated that an

---

27    GX 57; Tr. 1068, 1071-72, [Cascione] 1131-32 [Berry], 3358 [Kelly], 3658-59 [Jennings].
28    GX 30; Tr. 741-42 [Pierrard].
29    GX 33, 34; Tr. 1007-08 [Cothran]; Tr. 1138, 1141-42 [Berry].
30    GX 33.

unfavorable contract would be one where the contracted for rates vary unfavorably from market rates, that the contract had been negotiated six months prior to the email, and that it was unlikely that the Lee County, Florida, solid waste market had changed so drastically within that time period. Thus, Cothran testified that he advised Viard that the contract was not unfavorable.[31] The Court found Cothran's testimony credible. Had she heeded that advice and continued to apply her professional judgment in such manner through the reporting periods which followed, Viard might not be before this Court. Despite such advice, she recorded the purported liability, fraudulently increasing earnings not just in Q2, but also in Q3 and Q4.[32]

The Court concludes that the Lee County contract was not unfavorable. First, it was a five-year contract recently entered into through a competitive bid process, with all factors suggesting it was not unfavorable.[33] Second, Swisher's CEO Steve Berrard ("Berrard"), while offering contradictory testimony on a number of points, testified unequivocally that the Lee County contract was not an unfavorable contract: "This was not an unfavorable contract. This still was a good contract. It just made it less profitable than what we had been led to believe."[34] Third, the additional costs associated with performing the original scope of work were known at least in part to Swisher before the acquisition[35] and were certainly known by April 2011.[36] The Lee County entries were not made until July 2011 when Swisher was falling short of its earnings target.[37] Kipp's expert agreed that "to the extent that there are additional costs that come to your attention, you should book them when they're known to you," "[y]ou shouldn't wait several months to do that" and in

---

31    GX 33, 34; Tr. 1108-11, 1013-14 [Cothran].
32    GX 49, 51, 56, 84; Tr. 1672 [Berry].
33    Tr. 952-54 [Sampson]; 1013-14 [Cothran], 1138, 1141-42 [Berry].
34    Tr. 2278 [Berrard].
35    Kipp Exhibit ("KX") 1006; Tr. 2564-65 [Berrard].
36    KX 1306; Tr. 2565-66 [Berrard].
37    GX 30; Tr. 2566 [Berrard].

particular, "you shouldn't wait and make those adjustments when you need more earnings."[38] Yet, that is precisely what defendants did. Finally, defendants did not do any market analysis to support the purported conclusion this was a below market, i.e., unfavorable, contract.[39] Viard's expert confirmed that to determine if a contract is unfavorable "[y]ou're supposed to determine whether the terms in the contract you're evaluating are consistent with market terms for other contracts."[40] He then admitted that when determining that the Lee County contract was unfavorable, defendants had done no market analysis, and in particular, that the analysis that purportedly supported the entry did not include a market analysis.[41] He also confirmed that "the fact that you're making less profit does not necessarily make it an unfavorable contract," and that "market terms can include more than just one precise number."[42] Defendants simply assumed the exact amount bid was the market without any analysis and summarily concluded that the additional costs, i.e., the drop in profit resulting from Lee County requiring them to perform up to the scope of work, made it unfavorable.[43]

### 3. Bad Debt Entry

The second Q2 "bad debt entry" was also improper. The evidence showed that Swisher's policy was to use 0.5% of credit sales in determining what the bad debt reserve should be.[44] Applying that methodology in Q2 resulted in a $250,000 reduction to the reserve. But after this reduction was first properly taken and when more income was needed to hit the $3,000,000 target, Kipp went back and changed the percentage used to 0.3% so another $330,000 could be taken into income. This was not proper.[45]

---

38   Tr. 3456-57.
39   GX 51.
40   Tr. 3648.
41   GX 51, 51a; Tr. 3648-50.
42   Tr. 3651-52.
43   GX 51, 51a; Tr. 3650 [Jennings].
44   GX 23, 23a, 26, 26a, 26b; Tr. 647 [Eichstadt].
45   GX 30, 38, 39, 39a, 39b; Tr. 659-60 [Eichstadt].

The evidence showed that Kipp used the bad debt reserve as a "cookie jar" to which he could go to for additional earnings: "If we are short. We will get it in bad debt."[46] The evidence further showed that just as it is not proper to make accounting entries for the purpose of hitting earnings targets, it is not proper to change an accounting policy for the purpose of increasing EBITDA.[47] Thus, the second take down of the bad debt reserve to earnings during Q2 was intended to hit an earnings target, did not comply with the company's own methodology, and was improper.

***

These three fraudulent entries for Q2 -- Cascione, Lee County, and the second bad debt entry -- total approximately $630,000, which represents more than 20% of the $3,000,000 in adjusted EBITDA in Swisher's Form 10Q for Q2 2011.[48] Because these entries were false, the Court concludes that Kipp in his capacity as CFO falsely certified that the "financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Swisher for Q2.[49] For Q2, Kipp also submitted a Management Representation Letter to BDO, falsely certifying "no knowledge of any: (1) [f]raud or suspected fraud involving management."[50]

## C.     Third Quarter Reporting

Shortly after the end of Q3, on October 5, 2011, Kipp sent an email to Wells Fargo, providing a forecast of $5.2m in adjusted EBITDA for Q3 and a forecast of $3.5m for September.[51] The defendants' emails that post-dated the close of Q3 make it clear what the targets were and that

---

46      GX 40; Tr. 927-29 [Pierrard].
47      Tr. 3457 [Kelly]; 3622-23 [Jennings], 1203-04, 1685-90 [Berry].
48      GX 59 p.46.
49      GX 61.
50      GX 63; Tr. 1110, 1192 [Berry].
51      GX 391a; see also GX 388.

-13-

it was job of Swisher's accountants to meet those targets.[52] Further, those emails made it clear that defendants would move the ball across that line.[53]  After informing upper management that Swisher was $1 million short of adjusted EBITDA, Kipp was able to email upper management the next day, October 15, 2011, that they were at forecast, which he was able to do because he had directed Swisher accountants to increase EBITDA by approximately $1M or 20% to hit the $3.5m target.[54]

The Court finds that at least three of the Q3 entries were made for a fraudulent purpose and also fraudulent in and of themselves: (1) the Enviro earnout entry and (2) the Choice workers comp reserve take down entry.

### 1.    The "Enviro Earnout" Entry

The Enviro earnout entry was improper.  The testimony and evidence presented at trial showed that on Saturday, October 15, 2011, Kipp emailed Viard, stating, "I need to get about $300k in expense reductions," and identifying one area he thought might reduce expenses and benefit earnings.[55] Within an hour, Viard offered a "few other ideas" of her own for potential expense reductions to hit the number, stating that "[t]he Enviro earnout may have some potential but may … be stretching it."[56] While proposing a downward adjustment to the already established liability for the Enviro earnout, Viard also noted, "[w]e haven't wanted to reverse anything just yet, given that they have 3 years [to hit the revenue targets], but it is likely that they will not get the full $1M."[57] In a subsequent email, Viard explained to Kipp the positive impact the adjustment would have on earnings, stating "[a]s long as the changes are not material I wouldn't need to disclose."[58]  In

---

52      See GX 88, 97, 102, 106, 116, & 118.
53      Tr. 118-19 [Crawford], 539-40 [Robinson], 716-17 [Pierrard].
54      GX 102.
55      GX 91.
56      Id.
57      GX 92.
58      GX 98.

response, Kipp asked "How much of the Earn-out can we bring down to earnings."[59] Viard then

asked Pierrard: "Do you have the actual/estimated payment for the enviro earnout for Q2 and Q3?"[60]

Then, when Viard responded to Kipp's inquiry about how much could be brought down to earnings,

saying "it is anywhere from $200K to $700K," she still did not have the actual Q2 and Q3 payments

factored into her analysis.[61] Even when she sent the entry reflecting a $450,000 reduction to the

Enviro Earnout, her analysis still did not include the actual Q3 payment.[62]

Viard's analysis did not support the Enviro earnout take down because it failed to include

payments for the last two quarters of the earnout.[63] Swisher's initial analysis, upon which Viard

purportedly relied in assessing the take down, did not include payments for the last two quarters of

the earnout, supposedly because Swisher expected the $1,000,000 to be reached before the three

years expired.[64]  When the initial payments were lower than anticipated, a proper analysis would

have reallocated that shortfall to account for payments that would then need to be made in the last

two quarters of the three-year earnout.[65] The Court concludes that because Viard's analysis failed

to include a reallocation of that shortfall, it shows that the entry was not about getting the numbers

right; it was about fraudulently getting to the number.

The Court has also considered the evidence presented in defense of that entry. Viard

presented evidence that she contends supported the Enviro Earnout entry, specifically, Byrne stating

"[t]he company [Enviro] will not meet the estimates included in the acquisition pro-forma." As his

email and testimony make clear, Byrne did not do any objective analysis or provide any

---

59       Id.
60       GX 96; Tr. 790-91 [Pierrard].
61       GX 99; c.f. GX 228.
62       GX 101; c.f. GX 228.
63       GX 101; Tr. 3642-44 [Jennings].
64       GX 101, 101a; Tr. 2950-52 [Byrne], 3275 [Kelly], 3642-44 [Jennings].
65       GX 101, 101a; Tr. 3642-44 [Jennings].

documentary support until more than four months later, which occurred only after the former controller, Crawford, had reported the fraud.[66]

In addition, it is also apparent that the decision to book the Enviro earnout had no firm basis when, four days later, when the numbers were still below the Q3 target of $5,200,000, Viard wrote Kipp with "a list of adjustments"[67] including an additional $50,000 take down of the Enviro earnout. The defendants subsequently instructed that this additional take down be booked.[68] Clearly, what was driving this train was not dispassionate analysis of numbers by accountants attempting to disclose the actual earnings of a publicly traded company; rather, such actions were indicative of accountants adjusting numbers to meet management's projections. This additional $50,000 takedown was wholly unsupported.[69]

## 2. Choice Workers Comp Reserve Take Down

The Q3 Choice workers comp reserve take down was also improper. Even Kipp's accounting expert testified that reserves are an area "that's ripe for potential fraudulent manipulation," and that appropriate reserve levels are not supposed to be based on a desire to increase EBITDA or manipulate earnings, but on reasoned and informed judgment.[70]

While the Court credits Kelly's statement concerning the how reserves should be treated, the Court does not give similar weight to Kelly's conclusion that such takedown was proper. The Court concludes that such opinion was based on Kelly's incorrect understanding that "Swisher understood the workers' compensation insurance audit was substantially complete and the auditors

---

66    GX 244, 254; Tr. 2965-69 [Byrne].
67    GX 118.
68    GX 118, 120; Tr. 176-79 [Crawford].
69    GX 118.
70    Tr. 3351-52 [Kelly]; see also Tr. 3615-17 [Jennings].

did not object to the relevant governing class code used by Choice."[71] The evidence, however, established that at the time of the reserve take down, Swisher had not gotten the results from the audit.[72] To the extent that Kelly's opinion was based on what "Swisher understood," there was no evidence that the audit results were known to anyone at Swisher, much less those who decided on the take down; thus, those results could not provide a basis for the take down. Kelly's opinion as to the propriety of the reserve set up is also premised upon information that is factually incorrect, namely that the workers compensation policy in effect at the time of the Choice acquisition used the wrong governing class code.[73]

Beyond Kelly's opinion, the facts surrounding the take down point to the improper purpose of the entry. Kipp's own emails to Robert Oulahan ("Oulahan"), Choice's CFO, show that the reason for reducing the Choice reserves in Q3 was to increase earnings:

> I need to talk to you about your Q3 numbers. I need you to go back and squeeze them for an additional $220K of EBITDA. I suspect you should have room in some of your reserves. You should have $300K of Workers comp accruals we set up on the opening balance sheet that should still be there.[74]

In a subsequent email, Kipp stated "[a]t the end of the day if we get to the number I will let some come back your way."[75] Kipp then forwarded this email to Viard, who in turn ensured that the improper entry was booked.[76]

Further, Mr. Oulahan's testimony confirmed that at the time he received the email, Choice had already done its analysis of what the appropriate numbers were; that they had sent them to Swisher corporate; that they were waiting on the results of the workers' compensation audit; and

---

71      Tr. 3284-85 [Kelly].
72      GX 103; Tr. 3199 [Oulahan].
73      GX 451; Tr. 3366-80 [Kelly].
74      GX 93.
75      GX 103.
76      GX 105.

that he "thought the prudent thing to do at the time was wait until [he] got the results of the audit to make an adjustment."[77]   Oulahan testified that if Kipp "hadn't come back and asked [him] to squeeze [his] reserves for additional EBITDA, that's what [he] would have done, [he] would have waited for the audit."[78] That is, the numbers originally sent "were the right numbers."[79] But, he testified, Kipp asked him "to essentially take a reserve down to get some additional EBITDA."[80]

***

Swisher's Q3 10-Q included the above fraudulent entries.  The Q3 Enviro entry and Choice workers compensation entries total approximately $675,000k or 12% of the $5.2M adjusted EBITDA which Swisher reported in its Q3 10-Q.  In furtherance of that goal, Kipp falsely certified the accuracy of the Q3 financials to the SEC and to BDO.[81]  Equally, in Q3 Viard signed an internal certification, falsely certifying "the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition…for the periods presented in this quarterly report."[82] Based on the falsity of the underlying entries created to meet EBITDA, the Court finds beyond a reasonable doubt that defendants' certifications were equally false and that these defendants well knew they were false.

### D.    Fourth Quarter Reporting

As with Q3, the scheme continued through Q4 and 2011 year-end close.  As with Q2 and Q3, the scheme targeted meeting the adjusted EBITDA Swisher communicated to Wells Fargo. In

---

77      Tr. 3198-99.
78      Tr. 3202.
79      Tr. 3199.
80      Tr. 3198.
81      GX 147, 148, 149; Tr. 1192 [Berry].
82      GX 150.

-18-

particular, on the last day of the quarter, Swisher transmitted to Wells Fargo a forecast, which revised the Q4 adjusted EBITDA range downward to $5,400,000 from $6,500,000.[83]  Less than a week later, on January 3, 2012, Kipp emailed Viard, Pierrard, and others with: (1) a "starting point for December," i.e., where Adjusted EBITDA was at the time; (2) an Adjusted EBITDA "forecast" of $5,400,000 for them all to be "working towards"; and (3) a "hit list . . . of all the open items."[84]  Unlike Q2 and Q3, the Q4 post-quarter accounting shakedown did not go well for defendants.  By the end of January 2012, the conspiracy started to unravel with the firing of Crawford.

As with Q2 and Q3, defendants first made clear that $5,400,000 was the target for the accountants: "We are still short of the target. . . . We will get to $5.4 million. What are the options to find the remaining $131K?"[85]  On January 21, 2012: "Where do we stand at this point other than short of our mark?"[86]  On January 22, 2012: "It looks like we have found enough to clear $5.4 of adjusted EBITDA with a little wiggle room. . . . I would like to have some cushion in the event BDO finds a bad guy in the audit."[87]  And finally, on January 28, with adjusted EBITDA at $5.485m, "It is a bit higher than I thought we would get to. Let's freeze it here."[88]

Among the fraudulent entries booked to hit the $5,400,000 million target in Q4 were (1) another reduction to the Enviro earnout; (2) the bad debt entry; and (3) the Shamrock entry.  The Court will not revisit the Enviro earnout as it has been discussed at length, *supra*, and remained improper in Q4.  The Court will, however, explore the Q4 mutations on the bad debt entry again as well as the Shamrock entry as the pressure defendants placed on the controller on these entries ultimately led to the unraveling of the scheme.

---

83     GX 398; Tr. 773-74 [Pierrard], 1194-96 [Berry], 2062-67, 2121-22 [Harris].
84     GX 168, 168a.
85     GX 194.
86     GX 196.
87     GX 201.
88     GX 219.

## 1. Bad Debt Entry

The Q4 bad debt entry was improper. Not only was the Q4 entry improper, the bad debt reserve had been so depleted that it caused concern with the company's controller. Such depletion was neither accidental nor unintentional: earlier in both Q2 and Q3, Kipp reduced the bad debt reserve twice. In Q2, using the percentage consistent with Swisher's existing policy, a $250K adjustment was made, and then, when earnings were short, the percentage applied was changed so another $330K could be taken over to the income side of the ledger. In Q3, using the "new" percentage, an initial reduction was made to bad debt of $250K. [89] Kipp then directed an additional reduction of $150K when Swisher was not meeting its earnings target.[90] That is, Swisher's Q2 and Q3 income was increased by $980K through bad debt reversals. Of that, $480K was a result of the late, second entries made when Swisher was searching for entries to increase adjusted EBITDA.[91] Crawford's testified that as the 2011 financial year came to a close, it became apparent to him the bad debt reserve was significantly under reserved – by approximately $700k or $800k.[92]

When Crawford went to Kipp to inform him that the reserve would need to be significantly increased, resulting in a corresponding decrease to income, Defendant Kipp's response was "there's no way we're going to book that. No way."[93] Kipp then instructed Crawford to find another way to calculate the reserve so that they could avoid increasing the reserve and decreasing income.[94] Because this was not appropriate accounting and would have a "very material effect" on Swisher's

---

89    GX 1256, 89.
90    GX 110, 110a; Tr. 662-68 [Eichstadt].
91    Tr. 634-69 [Eichstadt].
92    Tr. 124-28, 196-97 [Crawford]; see also 803-04 [Pierrard].
93    Tr. 126-27 [Crawford].
94    Tr. 127 [Crawford].

-20-

books and records, Crawford testified he made no attempt to devise another way to calculate the reserve.[95]

With no help from Crawford, Kipp then asked Pierrard to look at the bad debt reserve and "go find an offset for [the deficit]," and "[f]ind a way to fill the hole" so that they would not be short of their $5.4m target.[96] Pierrard, a co-conspirator, then devised an entirely different methodology, calculating bad debt based on a percentage (5.08%) of the accounts receivable for each of the acquisitions, and making adjustments on the opening balance sheets of those acquisitions.[97] This methodology, cut from whole cloth, was completely inconsistent with Swisher's then existing bad debt policy[98] and resulted in $552k of the shortfall being fraudulently booked in a manner that did not affect Swisher's earnings.[99] As a result of Pierrard's creative accounting prompted by Kipp's instruction to find a fix, Swisher's Q4 earnings were well on their way to being overstated by more than $550k.

While jumping ahead, the Court finds most relevant discussions Kipp and Pierrard had concerning the bad debt entry for Q4 in the weeks that followed when the scheme unraveled and they were attempting to justify their actions by drafting the Rebuttal Memo. When Pierrard sat down with Kipp to walk through the bad debt calculation, Kipp responded: "We're fucked."[100] At that point, he instructed Pierrard to go back and calculate the bad debt reserve another way to come up with something they could sell.[101] Kipp and Pierrard then went through a series of calculations in an attempt to come up with something more justifiable than the fraudulent entry they had already

---

95     Tr. 127-29 [Crawford].
96     Tr. 804-05 [Pierrard].
97     GX 186, 188, 211, 211a, 211b, 211d; Tr. 803-14 [Pierrard].
98     GX 64; Tr. 929-32 [Pierrard].
99     Id., GX 211e.
100    Tr. 817-19 [Pierrard].
101    Tr. 819-20 [Pierrard]

made, first using 1.45% of revenue, then 0.24% of revenue, and then adding additional acquisitions to further reduce the negative hit to earnings.[102] In total, in an effort to fraudulently inflate Swisher's earnings in Q4 and at the direction of Kipp, Pierrard calculated the bad debt reserve in Q4 four different ways, using two entirely different methodologies and three different percentages.[103] When such new methodologies were applied, the fact that entries that would increase earnings went to the P&L and that entries that would decrease earnings went to the balance sheets and had no profit and loss effect confirmed for this Court the fraudulent nature of the Q4 bad debt entry.[104] Based on his demeanor in Court and the consistency of his testimony with the exhibits presented, the Court found Pierrard's testimony concerning the bad debt calculation credible and compelling.

## 2. The Shamrock Entry

The Shamrock entry for Q4 was also improper. As discussed briefly above, the scheme unraveled over the propriety of the Shamrock and bad debt entry, and it was the Shamrock entry which was "the final straw" for Crawford, leading to his termination, which opened the door for him to bring to light the fraud with BDO.[105] Put simply, Kipp, in an effort to hit the $5.4m target, sought to renegotiate rebates paid to a customer of a company it had recently acquired. He sought to eliminate rebate expenses paid as part of Swisher's ongoing relationship with the customer Shamrock by "renegotiat[ing] the Shamrock agreement so we can bring down the accrued rebates."[106]

Some background is necessary to understand this expense and the attempts to bring it down in 2012. In May 2011, Swisher acquired a sanitary supply company, ProClean, and the combined

---

102    GX 265, 265a, 272, 272a, K1531, K1531a; Tr. 820,-22, 922-24 [Pierrard].
103    GX 211, 211, 211b, 211d, 262, 265, 265a, 272, 273, K1531, 1531a; Tr. 803-23, 922-24, 918-32 [Pierrard].
104    Tr. 1201-04 [Berry]; 123-29, 196-98 [Crawford]; 807, 826-27, 838 [Pierrard]; see also 3457 [Kelly].
105    Tr. 83 [Crawford].
106    GX 168a.

Swisher/ProClean company began renegotiating the terms of its relationship with ProClean's main customer, Shamrock.[107] According to Dan Carroll ("Carroll"), Senior Vice President of Shamrock, part of the negotiations included additional rebates payable by Swisher to Shamrock for selling its products.[108] Apparently, it is customary in the business to provide "rebates" to key customers who buy large quantities of a company's product. Carroll testified and the exhibits indicate that by August 2011, Swisher/ProClean and Shamrock reached a meeting of the minds on the financial terms, including the rebates, as well as a separate "sole-source incentive" payment of $250,000, paid over five years for a total of $1,250,000.[109] Shamrock's acceptance of Swisher's proposal stated that Shamrock would send a Vendor Merchandising Agreement (VMA) "solidifying the proposal."[110] Consistent with that agreement, the parties entered into a VMA effective August 1, 2011.[111] This date was important to Shamrock because of a recent expansion.[112] Mr. Lebrun, who headed ProClean before the acquisition and was employed by Swisher after the acquisition, acknowledged he understood and agreed with the August 1 date and would "communicate accordingly with Swisher and have our contract reflect that."[113]

Mr. Carroll testified that prior to Swisher acquiring ProClean, Shamrock and ProClean had a long-term relationship. As part of that relationship, ProClean provided Shamrock with rebates and sales and marketing incentives. He testified that upon instructions of his senior management, Mr. Carroll negotiated similar rebates and incentives with ProClean/Swisher. After an exchange of emails and letters proposing and accepting terms, Shamrock had in place a signed VMA with

---

107     Tr. 467 [Kenneson], 424-25 [Carroll].
108     Tr. 428 [Carroll].
109     GX 50, Tr. 430-34 [Carroll].
110     GX 50, Tr. 431-32 [Carroll].
111     GX 48, Tr. 432-33 [Carroll].
112     Tr. 429-30 [Carroll].
113     GX 75, Tr. 434-35 [Carroll].

ProClean/Swisher in September 2011. The evidence presented indicated that the VMA was signed by September 29, 2011, by both Shamrock and ProClean/Swisher. Mr. Carrol further testified that the White Paper presented to the audit committee in 2012, indicating that no agreement was in place, was not consistent with his understanding or the executed VMA delivered to Shamrock. On cross examination by counsel for Kipp, Mr. Carroll testified that it was his understanding that Mr. LeBrun was authorized to execute the VMA. Indeed, the Court's review of GX 43 provides indicia that Mr. LeBrun had actual authority from senior management of Swisher. Mr. Carroll also testified that the "finished verbiage" on the "distributor agreement" did not occur until January 2012, under which the parties acknowledged that Shamrock had already been paid $100,000 and would be paid an additional $1,250,000 over the following 60 months. He also testified that August 1, 2011, was the start date of the VMA and it is clear from the record that even Mr. LeBrun, despite a confused voicemail, soon recognized that Shamrock was entitled to start taking rebates by August 1, 2011. Indeed, that date is reflected in the actual signed VMA.[114]

At least as early as September 13, 2011, Kipp knew that Swisher was paying Shamrock the rebates when he received an email from Pierrard explaining the expense.[115] In addition to the VMA, the parties negotiated a Distributor Agreement to reflect the terms of the arrangement.[116] Consistent with the agreement reached in August 2011, all of the early drafts of the Distributor Agreement reflected a start date in August 2011, incorporated the VMA as the contract governing rebate payments, and described the separate $1.25 million sole source payment.[117]

---

114    GX , Tr. 433-35 [Carroll], Tr. 476 [Kenneson].
115    GX 76, Tr. 474-76 [Kenneson].
116    GX 82, Tr. 429 [Carroll].
117    GX 82, 160, 166, Tr. 435-40 [Carroll], 2908–17 [Byrne].

As Q4 neared an end, Kipp identified the Shamrock rebates as a way to increase earnings, circulating a hit list that included "renegotiat[ing] the Shamrock agreement so we can bring down the accrued rebates."[118] To that end, Kipp's later emails to the accounting staff asking them for "options" to bridge the gap to the $5,400,000 bank forecast and included the $100,000 associated with the Shamrock rebates as one of the entries to hit "the mark."[119] Within days of circulating his hit list, the language in the Distributor Agreement changed:[120] the effective date changed to January 2012; and the amount of the sole source payment increased by $100k to $1,350,000. This change in amount was purportedly based on the rebate expenses in Q3 and Q4 "which already has been paid."[121]

The evidence presented at trial shows that Shamrock did not request the changes, that it was something Swisher wanted, that the changes did not represent actual additional consideration to Shamrock, and that Shamrock never agreed, nor would they ever have agreed, to forgive or return any rebates.[122] When Crawford reviewed the reversal of the Shamrock rebates as part of the year-end close, he had questions.[123] As part of his due diligence, Crawford contacted Lebrun and Denise Kenneson ("Kenneson"), controller for the ProClean division of Swisher.[124] Crawford testified that he learned that Shamrock never agreed to return or forgive the rebates paid by Swisher in Q3 and Q4, and that the changes to the Distributor Agreement were "just semantics," as the "payments had essentially nothing to do with the new contract," but instead "would be owed to Shamrock regardless of whether a new agreement [was] signed."[125] Crawford also tried unsuccessfully to get answers

---

118     GX 168a, *see also* 167, 168a, 174, Tr. 83-84 [Crawford].
119     GX 194, 196, Tr. 90-94 [Crawford].
120     GX 172.
121     GX 172, Tr. 440-41 [Carroll].
122     GX 203a, Tr. 441-44 [Carroll].
123     Tr. 85-86 [Crawford].
124     GX 215a, Tr. 86, 101-02, 107 [Crawford].
125     GX 183, Tr. 86-88, 106-108 [Crawford].

from Kipp and Mr. Byrne. Kipp referred Crawford back to Kenneson,[126] while Mr. Byrne referred Crawford to Kipp and then stopped responding altogether.[127]

Crawford concluded the accounting involved a straightforward application of the matching principal: Swisher should book the rebate expenses incurred in Q3 and Q4 in those quarters to match the revenues associated with the related sales.[128] Kenneson agreed that the "matching principal" dictated that rebate expenses incurred in Q2 and Q3 in connection with Q2 and Q3 sales should be booked in Q2 and Q3. [129] Swisher's auditor, Mr. Berry, confirmed that Crawford and Kenneson had the accounting correct, i.e., the expense should be booked "in the period that lined up with when it was earned."[130]

When Crawford continued to press his concerns, Kipp began to pressure Crawford.[131] When Crawford suggested running the issue by BDO, Kipp responded: "[Y]ou'll run it by me since I am the chief accounting officer. I am out of patience with this."[132] On January 25, 2012, Crawford sent Kipp an email laying out his "thought process" regarding the Shamrock entry and stating he would "be happy to hear [Kipp's] thoughts."[133] That same day, Kipp summoned Crawford to his office and fired him.[134] Mr. Berrard's testimony that he alone was responsible for terminating Crawford, that Kipp did not even make a recommendation, and that both Kipp's and Berry's memos written in temporal proximity to the discharge were wrong was not credible as the overwhelming credible evidence showed that it was Kipp who fired Crawford for defying his unlawful instructions.[135]

---

126    Tr. 88–89 [Crawford].
127    GX 212, Tr. 97-99, 104-05 [Crawford].
128    Tr. 85-86 [Crawford].
129    Tr. 476-78 [Kenneson].
130    Tr. 1221-22 [Berry].
131    GX 203, 206, 207, 208 Tr. 94-97, 102 [Crawford].
132    GX 210, Tr. 103-04 [Crawford]).
133    GX 215, Tr. 105 [Crawford].
134    GX 216; Tr. 105, 108 [Crawford].
135    GX 248; *c.f.* Tr. 2423-24, 2581-86 [Berrard].

### E.    The Ensuing Investigations

In late January 2012, as defendants were wrapping up the Q4 and year end reports, the scheme started to unravel. The firing of the controller got BDO's attention and when asked why he was fired, Kipp represented to BDO that Crawford was fired during the year-end close because he was failing at his job.[136]  The overwhelming evidence in this case reveals that the exact opposite was true:  Crawford was fired for doing his job.

Byron Berry, an accountant with BDO and Swisher's auditor, interviewed Crawford after he was fired, and Crawford reported the existence of the fraudulent scheme.[137]  After that discovery, BDO communicated Crawford's concerns that Swisher was preparing "materially false or misleading financial statements" to the chairman of Swisher's Audit Committee, who commissioned an investigation into the accounting fraud allegations.[138] In the end, Kipp never disclosed the real reason for firing Crawford, which was his refusal to make the fraudulent Shamrock entry in Swisher's books and his expressed intent to "run it by" BDO.[139] After firing Crawford, Kipp thereafter gave the job of controller to Viard as the investigation got underway.[140]

## V.    Discussion of the Charges

### A.    Count One: Conspiracy

In Count One, both defendants are charged with participating in a Section 371 conspiracy to commit securities fraud, a Section 371 conspiracy to make false and misleading statements to Swisher's auditors and accountants, and a Section 371 conspiracy to falsify Swisher's books,

---

136    GX 248 &. Tr. 1938-39 [Garcia]; c.f.  GX 187 Tr. 384-87 [Crawford].
137    GX 253, 254, 259; Tr. 1214-16 [Berry]; Tr. 114-17 [Crawford].
138    GX 255, 256; Tr. 1222-25 [Berry].
139    GX 206, 208, 210; Tr. 79 [Crawford].
140    GX 242.

-27-

records and accounts. The Court will discuss these three conspiracies *seriatim* and whether the government has met its burden of proving each element of each charge beyond a reasonable doubt.

### 1.    Securities Fraud Conspiracy

The elements of a conspiracy to commit securities fraud are: (1) an agreement to commit securities fraud; (2) that the defendant knowingly and willfully became a member of the conspiracy; (3) that one of the conspirators committed an overt act; and, (4) that an overt act was committed in an effort to effect or accomplish some object or purpose of the agreement. United States v. Hedgepeth, 418 F.3d 411, 420 (4th Cir. 2005); Hagen v. United States, 2014 WL 3895062, at *8 (W.D.N.C. Aug. 8, 2014).

In proving defendants conspired to commit securities fraud, the United States need not prove that defendants committed all of the elements of securities fraud. Pinkerton v. United States, 328 U.S. 640, 643 (1946). Indeed, the teachings of Pinkerton have been closely followed as to Viard in considering the conspiracy charges because, for the reasons discussed infra, the government has not proved beyond a reasonable doubt that she acted with the requisite fraudulent intent in Counts II and III. However, under Pinkerton, the evidence is sufficient to prove beyond a reasonable doubt that Viard conspired with her co-defendant and others to commit securities fraud.

The evidence established beyond a reasonable doubt that defendants conspired to commit securities fraud by manipulating Swisher's reported earnings to defraud the investing public and their bank, Wells Fargo, through material misrepresentations related to Swisher's financial position, as reported in its Forms 10-Q. As part of that scheme, defendants conspired to make false and/or misleading statements to Swisher's auditors, BDO, and to create false books and records. In particular, the emails of the defendants and the testimony made it readily apparent that the purpose of the scheme was to ensure Swisher consistently reported that its adjusted EBITDA met or

-28-

exceeded executive management's forecasts, including forecasts Swisher provided to its lender, Wells Fargo. It was also apparent from the testimony that defendants intended to conceal the existence of the fraud from, among others, BDO, Wells Fargo, and the investing public.

Kipp was the CFO and part of Swisher's executive management team.[141] The evidence showed that he was also the architect of the fraudulent earnings management scheme, communicating earnings targets and directing members of the accounting staff to identify positive entries and offsets for negative entries so that Swisher would reach the targets he repeatedly communicated via emails.

Viard is a certified public accountant and was Swisher's Director of External Reporting, a gatekeeping role in which she was responsible for ensuring Swisher filed fair and materially accurate financial statements with the SEC.[142] The evidence showed that, after what appeared to be initial concerns for which she sought outside advice which she then ignored, Viard fully participated in the conspiracy by assisting Kipp in his earnings management scheme to meet projected EBITA. Not only would she provide post-quarter suggestions as to how to reduce expenses to hit earnings targets, she communicated back and forth with Kipp through emails to ensure that as the numbers changed the reported adjusted EBITDA remained above the earnings target. The Court is convinced beyond a reasonable doubt that Viard's participation in the scheme was, after that initial hesitation, both knowing and willful when she continued to engage in the scheme after raising her initial concerns and ignoring the sound advice she received.

In some cases where otherwise law-abiding citizens turn to criminal activity, it is difficult to discern the moment it all went wrong or what motivated that person to act in a manner inconsistent with their prior upstanding behavior. Here, the evidence showed that prior to 2011 both defendants

---

141    GX 19, p.7; Tr. 2183 [Berrard].
142    GX 442, 150; Tr. 636-37 [Eichstadt].

led exemplary lives. For Kipp, that moment came shortly after he was appointed as the Senior Vice President and Chief Financial Officer of Swisher in May 2011.[143] At trial, Stephen Hill, Swisher's head of Human Relations, testified concerning executive compensation in 2011. In particular, Hill testified that in its 2011 form 10K, Swisher reported that executive compensation would include a bonus incentive program. [144] This bonus incentive program included a 40% bonus for Kipp if Swisher achieved adjusted BIDTA before December 31, 2011, as well as substantial stock.[145] Thus, Kipp, as a senior executive, would earn a significant bonus if Swisher met its adjusted EBITDA targets[146] and would significantly benefit under a "stock incentive plan" with equity awards valued at $400K when issued.[147]

Having considered all the evidence as discussed above, the Court is convinced beyond a reasonable doubt that defendant conspired with each other as well as others to commit securities fraud. The evidence showed an agreement to commit securities fraud in that defendants worked together through earnings management to make sure the books, records, and quarterly reports of Swisher met adjusted EBITDA. The evidence also showed that both defendants knowingly and willfully became a member of the conspiracy as the evidence presented showed that both defendants were confronted with the unlawfulness of their acts, but continued with the unlawful conduct. As to Kipp, that confrontation came when Crawford pointed out the improper nature of the Shamrock entry. As for Viard, that moment came when she sought outside advice on the Lee County contract but ignored the advice that such entry would be improper. The evidence also showed that both defendants committed overt acts in furtherance of the conspiracy, to wit, Kipp directing that

---

143     GX 19.
144     GX 226.
145     The evidence showed that in 2011, Kipp's salary was $220,000.00 starting May 10, 2011before bonuses.
146     GX 226 p. 69, Tr. 394–98.
147     GX 226 pp.66 & 68, Tr. 398–99 [Hill].

unlawful entries be made and Viard making or supervising such unlawful entries. Both defendants furthered the conspiracy by making improper certifications of the reports as being accurate, and those acts, among numerous others, furthered the object and purpose of the conspiracy.

### 2. False and/or Misleading Statements Conspiracy

The evidence proved beyond a reasonable doubt that both defendants conspired to make and cause false and/or misleading statements to Swisher's auditors under 15 U.S.C. § 78ff. The elements of a Section 371 conspiracy to violate Section 78ff are: (1) an agreement to make and cause false and/or misleading statements to Swisher's auditors; (2) that the defendant knowingly and willfully became a member of the conspiracy; (3) that one of the conspirators committed an overt act; and, (4) that an overt act was committed in an effort to effect or accomplish some object or purpose of the agreement. Again, under <u>Pinkerton</u>, the government is not required to prove that defendants committed all of the elements of a Section 78ff violation. <u>Pinkerton</u>, <u>supra</u>.[148]

The evidence establishes beyond a reasonable doubt that defendants both conspired to make and cause false and/or misleading statements to be made to Swisher's auditors, BDO. The undisputed and credible testimony of Berry (Swisher's auditor) established beyond a reasonable

---

[148]    The essential elements of making false and misleading statements to auditors under 15 U.S.C. § 78ff are, as follows:

   (1)    at the time of the alleged offense, the defendant was an officer of an issuer;

   (2)    the defendant directly or indirectly made, or caused to be made, a materially false or misleading statement, or omitted to state, or caused another person to omit to state, any material fact necessary to make such a statement not misleading;

   (3)    the statement or omission was made to an auditor or accountant in connection with the preparation of financial statements that Swisher was required to file with the SEC; and

   (4)    the defendant acted knowingly and willfully.

doubt that defendants conspired to make or cause to be made false and/or misleading statements to Swisher's auditors.

> Q.    Do you believe you were misled about the Choice severance issue during the second
>
>         quarter?
>
> A.    I do.
>
> Q.    Who do you believe misled you?
>
> A.    I believe Joanne [Viard] misled us on that.[149]

In addition to Berry's belief, the documents presented proved beyond a reasonable doubt that Viard had actually misled BDO. The auditors were questioning the accounting of the Cascione agreement at the time and asking for "the terms of the actual signed severance agreement to get further clarification."[150] Despite being in receipt of documents responsive to that request showing her accounting treatment was wrong, Viard withheld these documents from BDO.[151] That was patently an improper and purposeful act which furthered the conspiracy by delaying its discovery as it furthered false and/or misleading statements made to the auditors about the Cascione agreement. Defendants also knowingly and materially misrepresented in the Audit Committee meeting that there was a "[s]everance agreement in place at the time of the acquisition."[152] Again, this was patently false and was clearly material to the work of the auditors.[153]

As to the quarterly management representation letters provided to BDO by Kipp,[154] Berry testified that the management representation letters were important, i.e., were material, because

---

149    Tr. 1160 [Berry].
150    GX 55.
151    GX 55b, 55c, 55d; Tr. 1134-35.
152    GX 54, p.55, 57; Tr. 1154-59, 1669.
153    GX 57; Tr. 1669-70.
154    GX 63, 149.

auditors have to rely on management's representations to complete their work and if they cannot rely on those representations or have concerns about management integrity, it could prevent them from issuing an opinion on the accuracy of the financial statements.[155]

As to the termination of Crawford, Berry testified that Kipp misled him about Crawford's termination and that such lie was also material.[156] Berry testified that after discussing the termination with Crawford, he believed he had been misled because Crawford's "concerns were pervasive and discussed an earnings management approach that the company was utilizing with a lot of detail as to how that was being perpetrated within the company and the tone within the company, things of that nature."[157]

Defendants also lied to or misled the auditors through their failure to disclose that numerous accounting entries were made for the purpose of hitting an earnings target, and that such information, namely the information contained in the emails defendants sent at the time, would have been very important to the auditors, i.e. "a major concern," and would have affected their ability to perform an audit.

Based on all the evidence presented, the Court find beyond a reasonable doubt that there was an agreement between these defendants and others to make and cause false and/or misleading statements to Swisher's auditors, that the defendants knowingly and willfully became a member of the conspiracy, that numerous overt acts were committed by the conspirators as discussed above, and that such overt act were committed in an effort to effect or accomplish some object or purpose of the agreement.

---

155     Tr. 1105, 1109–11, 1154 1647–48 [Berry].
156     Tr. at 1216.
157     Id.

### 3. Falsifying Books Conspiracy

The Court further finds that the evidence proved beyond a reasonable doubt that both defendants conspired to falsify books under 15 U.S.C. § 78m(b)(2)(A).  The elements of a Section 371 conspiracy to violate Section 78m(b)(2)(A) are: (1) an agreement to make false and misleading reports to auditors and to falsify books; (2) that the defendant knowingly and willfully became a member of the conspiracy; (3) that one of the conspirators committed an overt act; and, (4) that an overt act was committed in an effort to effect or accomplish some object or purpose of the agreement.  Again, under <u>Pinkerton</u>, the government is not required to prove that defendants committed all of the elements of the offenses of a Section 78m(b)(2)(A) offense.  <u>Pinkerton</u>, <u>supra</u>.[158]

The evidence established beyond a reasonable doubt that defendants conspired to falsify or caused to be falsified Swisher's books and records. As set forth in detail above, defendants fraudulently directed Swisher accountants to make fraudulent entries to increase EBITDA so that Swisher would hit its earnings targets, including the targets sent to Wells Fargo for Q2 and Q3 2011,[159] that these fraudulent entries were made,[160] and that these entries resulted in Swisher's books and records being false.[161] The fraudulent entries were reflected in the adjusted EBITDA reported in Swisher's Q2 and Q3 2011 10-Qs.[162]   Thus, the Court finds that beyond a reasonable doubt defendants also conspired to falsify or cause to be falsified the books, records or accounts of Swisher.

---

158     The elements of the substantive underlying offense of falsifying books under 15 U.S.C. § 78m(b)(2)(A) are, as follows: (1) that defendant willfully and knowingly falsified, or caused to be falsified; (2) the books, records, or accounts of Swisher.
159     See e.g., GX 35, 39, 56, 84, 94, 105, 110, 113, 119.
160     GX 26b, 39b, 49a, 51b, 110a, 119a, 129a, 189b, 198a, 203b, 211e.
161     Tr. 82-83, 139, 219 [Crawford], 539-40 [Robinson], 714-20, 732-33, 838 [Pierrard], 1184-85, 1200 [Berry].
162     GX 59, p.33; GX, pg.30.

**B.      Count Two:  Wire Fraud**

In Count Two, both defendants are charged with wire fraud. The essential elements of wire fraud under 18 U.S.C. § 1343 are, as follows:

**(1)**      the existence of a scheme to defraud;

**(2)**      the use of wire communication in furtherance of that scheme;

**(3)**      the defendant acted knowingly, willfully, and with the intent to defraud.[163]

Proof of intent may be satisfied by "'the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself.'"  Id. (citing United States v. Green, 745 F.2d 1205, 1207 (9th Cir.1984)). Often, an intent to defraud is accompanied by conduct evincing a desire for personal gain that would be furthered by accomplishing the fraud.  This Court's colleague in the Eastern District of Virginia aptly described that conduct which ordinarily accompanies an intent to defraud in a jury instruction, as follows:

> To act with an "intent to defraud" means to act knowingly and with the intention or the purpose to deceive or to cheat. An intent to defraud is accompanied, ordinarily, by a desire or a purpose to bring about some gain or benefit to oneself or some other person or by a desire or a purpose to cause some loss to some person.

United States v. Chinasa, 789 F. Supp. 2d 691, 698 n.5 (E.D. Va. 2011), aff'd, 489 Fed. Appx. 682 (4th Cir. 2012).

The Court has considered all of the evidence in light of these elements and determined that the government has satisfied its burden of proving each element as to Kipp beyond a reasonable doubt.

---

163      *United States v. Bermes*, 9 Fed. Appx. 207, 209 (4th Cir. May 23, 2001) (holding that "the Government must also prove fraudulent intent," citing inter alia to § 1343).

As to Viard, the Court is not convinced that such burden has been satisfied on the intent to defraud as the Court was not satisfied that her alleged intent to defraud was accompanied by personal gain above compensation that she would have ordinarily received.  As to Viard, the government did not prove beyond a reasonable doubt that she had the requisite intent to defraud. While the government pointed to Viard receiving a raise[164] and that she was eventually promoted after much of the unlawful conduct occurred, the Court cannot find that such incentives were of significant magnitude to indicate an intent to defraud based on pecuniary gain.  In particular, Hill testified that in July 2011, Kipp gave Viard an increase in compensation plus bonuses and stock options at the vice presidential level, which coincided temporally with Viard's decision to make improper entries; however, there was no evidence that she stood to benefit in a manner similar to Kipp who participated in the executive compensation plan announced in the 2011 10-K. While the evidence proved beyond a reasonable doubt that she was a willful and knowing participant in the conspiracy to falsify Swisher's books and made false and misleading statements to Swisher's auditors, the evidence was insufficient to prove that she had the requisite intent to defraud as there was little evidence that she had a desire or a purpose to bring about some future gain or benefit to herself or some other person, or that she had a desire or a purpose to cause some loss to some person. While there was also evidence that Kipp promoted her to controller in February 2012 after the scheme started to unravel, this Court is simply not convinced beyond a reasonable doubt that such advancement was *quid* for any *quo* that can be tied to an intent to defraud.

As to Kipp, the evidence was overwhelming on each element of wire fraud, including that he had the requisite intent to defraud and that such intent was clearly supported by his participation in the executive compensation package for 2011. Clearly, examination of the scheme itself –use of

---

164      GX 21.

wire communications to facilitate the fraudulent adjustment of quarterly and annual reports after the fact to meet EBITA targets – show that Kipp had the requisite intent as he was the originator and chief proponent of the scheme. The government presented evidence showing beyond a reasonable doubt that the scheme he developed was reasonably calculated to deceive persons of ordinary prudence and comprehension.  The evidence presented showed beyond a reasonable doubt that Kipp's unlawful activities amounting to wire fraud were motivated by personal financial gain, to wit, by using emails to orchestrate the scheme, Kipp would receive a substantial bonus that was contingent on meeting EBITA.

The evidence established beyond a reasonable doubt that he committed wire fraud in violation of 18 U.S.C. § 1343. The evidence establishes beyond a reasonable doubt that he engaged in a scheme to defraud, had the specific intent to defraud, and used wire communications in furtherance of that scheme, including, for example, e-mails and phone calls from Charlotte, North Carolina, to Choice executives, including Mr. Oulahan, in Florida,[165] and the filing of the Q2 and Q3 2011 10-Qs electronically with the SEC.[166]  Finding that the government has proved each element beyond a reasonable doubt, the Court finds Kipp guilty of Count Two.

### 3.    Count Three: Securities Fraud

In Count Three, both defendants are charged with securities fraud, or aiding and abetting securities fraud.  The essential elements of securities fraud under 18 U.S.C. § 1343 are, as follows:

(1)    The defendant did any one or more of the following in connection with the purchase or sale of a security:

(a)    employed a device, scheme, or artifice to defraud; or

(b)    made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements

---

165    Tr. 1679-80, 1690 [Berry].
166    Tr. 1697 [Berry], 1760, 1772 [Wittman].

made, in the light of the circumstances under which they were made, not misleading; or

(c)     engaged in a transaction, practice or course of business that operated or would operate as a fraud and deceit on any person;

(2)     In connection with the purchase or sale of a security, the defendant made use of or cause the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange; and

(3)     The defendant acted knowingly, willfully, and with the intent to defraud.

The Court has also considered Count Three as charged insofar as defendants are accused of aiding and abetting one another.[167] Further, this Court remains mindful of the requirements for proving intent to defraud as discussed above. The Court is also guided by a recent decision of the Court of Appeals for the Fourth Circuit, which held as follows:

> If the government proves that a defendant was responsible for financial reports that intentionally and materially misled investors, the statute is satisfied. The government is not required in addition to prevail in a battle of expert witnesses over the application of individual [Generally Accepted Accounting Practice] rules.[168]

As to Viard, the government again did not prove beyond a reasonable doubt that she had the requisite intent to defraud. While the evidence proved beyond a reasonable doubt that she was a willful and knowing participant in conspiracies to commit securities fraud, to falsify Swisher's books, and to make false and misleading statements to Swisher's auditors, the evidence left the Court with a reasonable doubt that she had a desire or a purpose to bring about some gain or benefit to herself or

---

[167]     Under 18 U.S.C. § 2, the guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by him through the direction of another person as his or her agent, or by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise. If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct. However, before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the *intent* to bring about the crime.

[168]     *United States v. Rand*, 835 F.3d 451, 464 (4th Cir. 2016).

some other person or had a desire or a purpose to cause some loss to some person. Perhaps most importantly to the Court, there was no evidence that Viard stood to gain financially in the manner Kipp stood to gain if Swisher met adjusted EBITA.

As to Kipp, the evidence establishes beyond a reasonable doubt that he committed securities fraud as the government has proven his guilt beyond a reasonable doubt on each. First, securities fraud does not require proof of a GAAP violation. Second, as it relates to willfulness, "the government is not required to prove that the defendant knew he was violating the law," rather, willfulness is established if the government proves that "the defendant intended to commit the act prohibited."[169]

For acts to amount to securities fraud, it is the government's burden to prove that such acts were material. Here, the evidence establishes that the fraudulent entries in Q2 and Q3 2011 were material when considered quantitatively and qualitatively. First, the evidence showed that adjusted EBITDA was important to investors and stock analysts when evaluating Swisher's financial condition.[170] The analyst who followed Swisher confirmed EBITDA was the "primary metric" he used to "evaluate the progress the company was making."[171]

Examining the fraudulent entries as a percentage of the reported Adjusted EBITDA proves Defendants' securities fraud was quantitatively material. Generally, "[a] material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction."[172] In considering securities fraud, courts generally use five percent as a starting point for evaluating whether fraudulent conduct is quantitatively material.[173] Here, the fraudulent

---

169    *United States v. Kaiser*, 609 F.3d 556, 568 (2d. Cir. 2010) (citing cases).
170    GX 59, 145.
171    Tr. 1837.
172    *Chinasa*, 789 F. Supp. 2d at 698.
173    *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011).

-39-

adjustments in Q2 and Q3 well exceeded that threshold.   In Q2, the fraudulent entries associated

with Cascione, Lee County, and bad debt constituted more than 20% of the total reported Adjusted

EBITDA of $3,000,000.[174] The Cascione and Lee County entries alone represent $297,692 or

approximately 10% of the Adjusted EBITDA. In Q3, the fraudulent entries well exceed the 5%

threshold. In particular, the Enviro earnout and Choice workers compensation entries total $675,000

or approximately 12% of the reported adjusted EBITDA; with the inclusion of the ongoing

fraudulent entries for Cascione and Lee County (approximately $170,000), the fraudulent entries

represent more than 16% of the total $5,200,000 reported adjusted EBITDA.[175] Even Kipp's

materiality expert Ms. Mayer confirmed that the "allegation-relevant items" accounted for well in

excess of five percent as compared to the total reported adjusted EBITDA in Q2 and Q3.[176] Thus,

the Court finds that the fraudulent entries were quantitatively material.  The Court has given little

credit to the conclusions of Mayer that the entries were not quantitatively material when viewed

through the prism of "Earnings Per Share" ("EPS").  Clearly, adjusted EBITDA and not EPS was

the metric relied on by Swisher and by stock analysts.[177]  Further, Mayer's focus on predicted price

change improperly ignores other relevant factors.[178]  Based on all the evidence, the Court finds the

conduct to be quantitatively material.

   While the quantitative nature of the fraud is sufficient to carry the government's burden, the

Court has also considered the qualitative nature in light of Kipp's arguments. The government has

also proved beyond a reasonable doubt that Kipp's fraud was qualitatively material. Courts

examining qualitative materiality regularly look to SEC Staff Accounting Bulletin Number 99

---

174    GX 39, 39b, 49, 49b, 51, 51b, 59.
175    GX 119, 119a, 129, 129a, 145.
176    Tr. 3068–69.
177    Tr. 1754–55, 1837 [Whitman]; GX 59, 60, 144, 145.
178    *S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 240-41 (4th Cir. 2009).

("SAB 99") for guidance.[179] During trial, the evidence revealed the presence of many of "the considerations that may well render material a quantitatively small misstatement of a financial statement material" listed in SAB 99 and considered by courts, including whether the misstatement (1) "masks a change in earnings or other trends," (2) "changes a loss into income or vice versa," (3) "affects the registrant's compliance with loan covenants or other contractual requirements," and/or (4) "has the effect of increasing management's compensation—for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation."[180] When viewed in light of SAB 99, Kipp's fraudulent manipulation of Swisher's books and resulting filings touches all the bases, satisfying the Court that the conduct is also qualitatively material.

Finally, the Court has also given full consideration to Kipp's argument that there is no securities fraud without a GAAP violation.[181] While a good-faith reliance on GAAP is an appealing defense, there is no requirement that the government prove that a particular entry is non-compliant with GAAP.[182] Put another way, "GAAP rules are no shield if the evidence shows that the accounting methods known to be misleading—although at times fortuitously in compliance with particular GAAP rules—were used for the express purpose of intentionally misstating [the company's] financial condition."[183] While GAAP may be relevant for the limited purpose of attempting to "negate the government's claim of an intent to deceive" by showing "a defendant's good faith attempt to comply with GAAP,"[184] there was no credible evidence that Kipp made "a good faith effort" to comply with GAAP when directing these fraudulent entries be made. In fact,

---

179   *United States v. Hatfield*, 724 F. Supp. 2d 321, 326 n.3 (E.D.N.Y. 2010).
180   SAB No. 99, 64 Fed. Reg. at 45152.
181   Tr. 1377.
182   *Rand*, 835 F.3d at 464 (citation and corresponding quotation marks omitted).
183   *United States v. Tomasetta*, 2011 WL 6362562, at *3 (S.D.N.Y. 2011) (citation and corresponding quotation marks omitted).
184   *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006).

when presented with opportunities to act in accordance with GAAP, Kipp: ignored the advice as with the Lee County contract; failed to do a quarterly analysis of the Enviro earnout; failed to wait for the audit results before reducing the Choice reserves; and fired Crawford when he refused to act in a manner inconsistent with GAAP.

As to Kipp, the evidence proved beyond a reasonable doubt that he committed each element of securities fraud and that he had the requisite intent to defraud. As discussed above, the evidence presented on intent showed beyond a reasonable doubt that Kipp's unlawful activities amounting to securities fraud were motivated by personal financial gain, to wit, receiving a substantial bonus that was contingent on meeting forecast EBITDA. Further, the government presented evidence showing beyond a reasonable doubt that Kipp developed the scheme, that such scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension, and that he used an instrumentality of interstate commerce (email and telephone) to further that scheme, all in connection with the purchase or sale of a security. The evidence shows that Kipp sent e-mails and placed phone calls from Charlotte, North Carolina, to Choice executives, including Oulahan, in Florida, and filed Q2 and Q3 2011 10-Qs electronically with the SEC. Finally, the evidence shows that his conduct was material under both a quantitative and qualitative analysis.

### 4. Count Four: Bank Fraud

In Count Four, Kipp is charged with bank fraud under 18 U.S.C. § 1344(1) and 18 U.S.C. § 1344(2). The essential elements of bank fraud under Section 1344(1) are, as follows:

**(1)** the defendant knowingly executed or attempted a scheme or artifice to defraud a financial institution;

**(2)** he did so with intent to defraud; and

**(3)** the institution was a federally insured or chartered bank.

The elements of bank fraud under Section 1344(2) are, as follows:

**(1)** the defendant knowingly executed [or attempted to execute] a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody of, a financial institution by false or fraudulent pretenses, representations, or promises;

**(2)** the defendant did so with intent to defraud; and

**(3)** the institution was a federally insured or chartered bank.

The Court concludes that the government has proved beyond a reasonable doubt that Kipp engaged in bank fraud under both Section 1344(1) and 1344(2). By means of false certifications and other communications, Kipp committed bank fraud both with regard to Swisher's existing Wells Fargo credit facility and in an effort to obtain additional financing in connection with the G&K deal.

The evidence established beyond a reasonable doubt that Swisher obtained a $100,000,000 credit facility from Wells Fargo in March 2011, which provided Swisher with capital to "augment [Swisher's] acquisition strategy" and "announced to the market that they were credit worthy."[185] The credit facility included financial covenants and certification requirements, requiring Swisher to meet minimum adjusted EBITDA thresholds and report any material change in accounting policy.[186] As the overwhelming evidence showed, Kipp thwarted those requirements by meeting adjusted EBITDA only through a scheme of earnings management founded on improper accounting entries and that he failed to report changes in accounting policies upon which those entries were based. Further, the evidence showed that Kipp's certifications were patently false.

The credit agreement required that Swisher provide quarterly financial statements and compliance certificates. As CFO, Kipp certified that the financial statements provided to Wells Fargo "fairly present[ed] the financial condition of [Swisher]."[187] While the evidence made it clear

---

185    GX 376, Tr. 2035, 2041.
186    GX 376, Tr. 2034–47, 2074–75.
187    GX 381, 394, Tr. 2043–47.

that Kipp made those certifications, those certifications in no manner reflected the true financial condition of Swisher. Likewise, the evidence showed that the financial statements (10-Qs) and certifications provided in connection with the credit agreement were important to Wells Fargo, which relied on that information to "measure [Swisher's] financial performance" and assess "the ability of [Swisher] to repay [the] loan."[188]  According to Cavan Harris, who served as Wells Fargo's Commercial Relations manager for the Swisher account,[189] it was "important to Wells Fargo that the information in th[e] financial statements was fair and accurate."[190] The testimony revealed that Wells Fargo "expect[ed] with all borrowers that there's candor and honesty in the submission of financial statements" and if the bank was aware that a company was knowingly submitting incorrect information, it would not lend to that company, regardless of the amount of the misstatement.[191] Put another way, the knowing misstatement of financial information would have been a deal ender for Wells Fargo.  The testimony of Swisher's CEO to the contrary was not credible when considered alongside the testimony of the bank's representative.

As discussed above, Swisher's Q2 and Q3 2011 10-Qs contained false and/or misleading information, in particular with regard to the reported adjusted EBITDA, as a result of Kipp's fraud. As such, when Kipp submitted compliance certificates to the bank falsely certifying that Swisher's financial statements were fairly presented, he defrauded the bank. Had Wells Fargo been aware of the intentional misstatements, testimony from the bank's relationship manager, Mr. Harris, was compelling that it would not have loaned Swisher money.[192] Mr. Harris testified in the following manner:

---

188     Tr. 2043.
189     Tr. 2029.
190     Tr. 2046.
191     Tr. 2120–21.
192     Tr. 2120–21.

-44-

Q.　You were asked a bunch of questions about the value of the amount of Swisher's EBITDA to the overall financeable EBITDA on this chart. Do you recall that?

A.　Yes, sir.

Q.　Regardless of the amount, if any of these numbers from Swisher were intentionally misstating EBITDA, would that have mattered to Wells Fargo?

A.　Yes, sir.

Q.　Why would that have mattered?

A.　We expect with all borrowers that there's candor and honesty in the submission of financial statements. And if you know it to be incorrect, we would not -- I mean, we would not lend based on that basis.[193]

Further, Kipp's submission of fraudulently inflated financials was also bank fraud as such acts were also intended to fraudulently induce Wells Fargo to provide financing for the G&K deal. In connection with discussions about how much Wells Fargo would be willing to loan Swisher, Kipp provided Wells Fargo forecasts for Swisher's Adjusted EBITDA late in Q3 and Q4, as well as actual reported numbers for Q3.[194] The numbers Kipp provided were important to show "a track record that [Swisher was] doing well" and because the calculation for the amount Wells Fargo was willing to lend was a "multiple" of Swisher's and G&K's EBITDA.[195]　Put another way, the higher the EBITDA, the greater the loan.

The Court has considered Kipp's argument that G&K's own EBITDA was much larger and, therefore, the adjusted EBITDA forecasts he provided for Swisher did not matter to the bank.[196] This argument has been given little weight as the evidence revealed it was *Swisher's* ability to repay the loan that was of prime importance to Wells Fargo.　Indeed, Harris testified that Swisher's

---

193　Tr. 2120-21 [Harris].
194　GX 388, 391, 391a, 401; Tr. 2054–55, 2058–60, 2063–67, 2075–78.
195　Tr. 2051–52.
196　Tr. 2048–52.

forecasts were important to show that the acquiring company had a solid, consistent foundation.[197] Moreover, the forecasts of Swisher's adjusted EBITDA were a component of the financing calculation, which Wells Fargo was interested in and asked specific follow-up questions about.[198] When Swisher reported that it missed a forecast in Q4, Harris described that it was a "big deal" and spoke directly with Berrard about Wells Fargo's "concern."[199]

Indeed, Kipp himself recognized the importance of Swisher's forecasts to the bank. For example, on December 31, 2011, Kipp and another executive emailed those involved in the G&K financing to report that Swisher was revising its Q4 forecast down to a range of $5,400,000 to $6,500,000.[200] According to the bank's representative, this revised forecast was a "big deal" and caused "serious, legitimate concern" at Wells Fargo.[201] The bank viewed the $5.4M forecast as "the basement of where [Swisher] would hit" based on the timing and had Swisher missed the revised number, it would have impacted Wells Fargo's lending decision and would have put the financing "in jeopardy."[202]

The evidence showed, however, that the $5.4M was not really Swisher's earnings, but instead became the target of the earnings management scheme for Q4 that Kipp worked to meet through fraudulent, one-sided accounting entries. Thus, Kipp further defrauded Wells Fargo in Q4 by knowingly providing financial information, in connection with the G&K discussions in an effort to obtain financing. Had Wells Fargo known Kipp and others were intentionally misstating the numbers, Wells Fargo would not have provided Swisher financing.[203] Consequently, the results

---

197    Tr. 2051.
198    Tr. 2055–57.
199    GX 401; Tr. 2075–78.
200    GX 398.
201    GX 401; Tr. 2076–78.
202    Tr. 2066–67, 2077–78, 2119–21.
203    GX 401; Tr. 2120–21.

Kipp provided Wells Fargo were false and/or misleading.  The Court is, therefore, satisfied beyond a reasonable doubt that Kipp committed bank fraud.

## VI.     Discussion of Certain Defenses

While the Court has attempted to discuss relevant defenses in the context of the discussion of the facts and the discussion of the charges, a number of defenses raised cut across and are applicable to multiple charges.  For the purpose of efficiency and clarity, the Court will discuss a number of those defenses collectively.

### A.     Specific Intent to Defraud

The Court has considered whether each defendant (Viard in Counts Two and Three and Kipp in Counts Two, Three, and Four) had the requisite intent to defraud.  While the Court has discussed such intent at length in regards to the substantive discussion of those Counts, the Court will discuss other aspects of intent that cut across the applicable Counts.

As to the fraudulent intent of Viard required in Counts Two and Three, the government argues in its Post-Trial Brief[204] that while she "was not the architect of the fraud, she quickly reached a tipping point, and at that point chose fraud." Id. at 23.  While the Court believes the government's argument that she reached a "tipping point" to be an apt one, the Court cannot conclude that her actions thereafter, while evincing a knowing and willful participation in the conspiracy, carried with them the required fraudulent intent.

Specifically, when Kipp initially instructed her to alter the accounting to record for the Lee County contract to that of an unfavorable contract, Viard sought guidance from Swisher's outside consultant.[205]  In particular, she wrote that she was "getting a lot of pressure to record a liability."[206]

_____

204     Docket entry #169.
205     GX 33, 34, 34a; Tr. 1008-18 [Cothran].
206     GX 33; Tr. 1008-18 [Cothran]; Tr. 1143-45 [Berry].

Viard went on to question whether they were "pushing the line a bit much here," noting that "it is not small dollars."[207] The advice she received back from the consultant was that it was not an underwater contract because it had been competitively bid for and won within the past few years and although "[i]t may be performing poorer than expected . . . seems to be within the allowable operating margins given the allowable structure of the final deal."[208] Thus, the evidence concerning outside advice shows beyond a reasonable doubt that Viard knew the entries she was being asked to make were unlawful and that she thereafter willfully participated in that conspiracy. Indeed, her acts were vital to the success of the conspiracy.

As the trier of fact, the Court must draw reasonable inferences from the evidence presented. Here, while the evidence proved that Viard knowingly and willfully participated in the conspiracies, the Court cannot find the "usual" pecuniary gain that typically accompanies fraudulent intent. While the evidence presented shows that she was well compensated and stood to participate in bonuses at the level of other Swisher vice presidents, there was no evidence that this Court could recall that tied her bonuses to meeting EBITDA under the executive management compensation plan. Thus, the evidence was only sufficient to show her participation in the conspiracies was motivated by a desire to keep her job, a motivation which was made all-to-real when Crawford lost his when he failed to go along with the scheme. While being threatened with termination from employment is no defense to acting unlawfully, Dixon v. United States, 548 U.S. 1 (2006), the fact that a person acted unlawfully to keep their job and their compensation does not satisfy the government's burden of showing specific intent to defraud, which is ordinarily accompanied by evidence of pecuniary gain. As to the post-Crawford promotion, the Court also cannot find that such was, beyond a reasonable doubt, motivation for Viard to commit fraud. Clearly, Kipp wanted

---

207     GX 33; Tr. 1101 [Cothran]; Tr. 1144-45 [Berry].
208     GX 33, 34; Tr. 1012, 1014 [Cothran].

a person he could trust in the controller position as he attempted to justify his course of conduct during the 2012 investigation. There simply was no evidence that such promotion placed Viard in the executive compensation plan for 2011. Her promotion to that position struck the Court as fortuitous for Viard and strategic for Kipp.

###    B.    Compliance with GAAP as a Defense to Fraudulent Intent

The elements of Counts II, III, and IV all require the government to prove that each defendant acted with the requisite fraudulent intent in addition to the other elements of those offenses. Based on all the evidence presented, the Court has found no merit in the first defense that the entries were lawful ones under GAAP as the evidence clearly showed that the justifications for entries (when there were justifications) were not compliant with GAAP. To the extent that GAAP is raised by both defendants as a defense to the conspiracy alleged in Count I, the same reasoning applies.

The Court has also considered as a secondary defense that if these accounting decisions were not in compliance with GAAP, they were simply mistakes unaccompanied by any unlawful or improper intent and were either the result of incompetence or overzealousness. First, as to the defense of a good-faith reliance on or interpretation of GAAP, Kipp's own emails show that he was simply attempting to *increase* EBITDA after the close of each quarter through accounting and earnings management.209 There simply was no evidence that he was in any manner attempting, as Chief Financial Officer, to accurately report the earnings of Swisher. In fact, his clear instructions to his subordinates from what is a morass of emails was to find only positive entries and a clear

---

209    Inasmuch as a defense need be considered only after the government has proved the relevant element, the Court has not discussed this defense as to the charges against Viard in Counts II and III inasmuch as the proof was not sufficient to show she acted with the requisite fraudulent intent, as discussed elsewhere at greater length.

warning that negative entries must be offset with positive ones. Even if GAAP were dumbed down, it cannot be that only positive entries should be reported.

As Kipp's own expert testified, the reason for an entry matters, and one way to determine what happened and why it happened is to look at the emails at the time.[210] This Court has reviewed those emails numerous times over the course of the trial and Kipp's fraudulent intent is readily apparent: Kipp's intent was to manage the books to a number by finding earnings and either ignoring or requiring negative entries to be offset, all in furtherance of artificially inflating Swisher's EBITDA to hit the targets set by management.

Likewise, Kipp's motivation was also readily apparent: a substantial bonus of nearly $100K and nearly half-a-million dollars in stock if targets were met. As Swisher was not performing as well as predicted by management, the only path to such a payday after December 31, 2011, was to create misleading financial statements.[211] To get there, Kipp needed the assistance of Swisher's accounting department, which he got through a series of what the Court found to be intimidating emails clearly commanding that management's projections be met in the quarterly reports. As to the element of fraudulent intent essential to Counts II, III, and IV, the evidence adduced at trial indisputably establishes Kipp's fraudulent intent beyond a reasonable doubt.

## VII. Conclusion

The evidence established beyond a reasonable doubt that both Viard and Kipp are guilty as charged in Count One, that Kipp is also guilty as to Counts Two, Three, and Four, but that Viard is not guilty as to Counts Two and Three. For the foregoing reasons and based on all the evidence presented at trial, the Court enters the following Verdict after a bench trial.

---

210    Tr. 3346-47 [Kelly].
211    Tr. 86, 94, 111-12, 118-19 [Crawford], 465 [Kenneson], 522 [Robinson], 719 [Pierrard], 1153-1154, 1692 [Berry], 3334-35, 3337, 3404-07 [Kelly], 3613-19 [Jennnings].

**VERDICT**

The Court finds, based on all the testimony and evidence presented, as follows:

1.      That defendant **JOANNE VIARD** is **GUILTY** of Count One and **NOT GUILTY**

as to Counts Two and Three.

2.      That defendant **MICHAEL KIPP** is **GUILTY** of Counts One, Two, Three, and

Four.

Signed: June 20, 2017

Max O. Cogburn Jr.
United States District Judge