**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-CR-00244-MOC-DSC**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER** |
| MICHAEL KIPP, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on Defendant Michael Kipp's Motion for Compassionate Release, brought pursuant to 18 U.S.C. § 3582(c)(1)(A). See Doc. No. 276. For reasons discussed below, Defendant's motion is denied at this time.

I.  **BACKGROUND**

On October 19, 2015, a grand jury for the Western District of North Carolina issued a bill of indictment, charging Defendant and his co-defendant, Joanne Viard, with several offenses, including: one count of conspiring to commit securities fraud, to make false and/or misleading statements to auditors and accountants, and to falsify books, records, and accounts; one count of wire fraud; one count of securities fraud; and one count of bank fraud. See Doc. No.1. The charges stemmed from Defendant's accounting fraud scheme, the object of which was to have Swisher Hygiene, Inc., meet management earnings projections each quarter, not necessarily through actual sales of goods and services, but through manipulation of accounting entries. See Doc. No. 196.

After a bench trial, the Court issued a Memorandum of Decision and Verdict, finding Defendant guilty of the identified offenses. See id. at 51. As the Court explained, Defendant's scheme was not particularly elaborate, but it was extensive. To summarize, shortly after Swisher became a public company, Defendant took several actions to manipulate Swisher's earnings to

fool investors into believing the company was achieving higher levels of Adjusted EBITDA[1] than it actually was, and to fool bankers into thinking the company was hitting financing benchmarks. Once the fraud was discovered, shareholders' stock value plummeted. Employees lost their jobs. See Trial Tr. at 2473–74. And Swisher faced potential delisting from the NASDAQ exchange. See id. at 1582, 2466. All told, the Court found that losses from the scheme totaled around $95 million. See Doc. No. 243 at 158.

At sentencing, the Court determined that Defendant's Total Offense Level was 43 and Criminal History Category was I, with an advisory Guideline range of life imprisonment, and a statutory maximum term of imprisonment of 900 months. See Doc. No 247 at 1. Nevertheless, the Government moved for a downward variance, asking the Court to sentence the Defendant to 144 months. See Doc. No. 240. The Court varied downward even further. On May 21, 2018, the Court sentenced Defendant to 54 months' imprisonment—a 94% downward variance from the maximum sentence. See Doc. No. 246. Thereafter, in June 2018, Defendant surrendered to the Federal Correctional Institution in Edgefield, South Carolina, where he has now served about half of his period of incarceration, including good time credit.

On April 27, 2020, Defendant filed the instant motion, seeking compassionate release from prison based on the COVID-19 pandemic. See Doc. No. 276. In support, he maintains that the COVID-19 pandemic, his age, and his health issues provide an extraordinary and compelling reasons for release, as he has a "high risk for severe illness or death if he contracts COVID-19." Doc. No. 277. Among other issues, Defendant, age 65, suffers from Type II diabetes, a severe buildup of plaque in his carotid arteries, and high cholesterol. See id. Defendant also alleges he

---

[1] EBITDA is a measure of a company's ability to produce income on its operations in a given year. It is shorthand for earnings before interest, taxes, depreciation, and amortization.

is especially at-risk because the Bureau of Prisons is unwilling or unable to contain the spread of COVID-19 in its facilities. See id. at 8–9. Specifically, Defendant alleges he is forced to live in close proximity with others and is thus unable to practice safe social distancing. See id. at 23. And, while prison staff have their temperature checked before entering the prison facility, they may nevertheless "be contagious without showing symptoms for up to two weeks or may be asymptomatic." Id. Furthermore, Defendant is concerned that the Bureau "may not" provide the "immediate medical attention needed to survive" if the "pandemic grows worse" and he contracts COVID-19. Id. at 26. Defendant thus maintains that extraordinary and compelling reasons support allowing him to serve the remainder of his sentence in home confinement. See id.

Defendant also contends that home confinement is supported by the sentencing factors articulated in 18 U.S.C. § 3553(a). To start, he notes that his crime was non-violent in nature. See id. at 19. Moreover, while imprisoned, he has not incurred any disciplinary violations and has participated in recidivism reduction programs. See id. Defendant thus contends that home confinement "will continue to reflect the seriousness of the offense" and will promote "respect for the law" by requiring him to remain confined. Id. at 28. Regarding specific deterrence, Defendant maintains that he has been deterred from future crimes because, while incarcerated, he has been unable "to support his family during [certain] times of grief and stress." Id. at 29. Defendant also notes that the Court acknowledged at sentencing that Defendant "is not likely to reoffend." Id. at 27. And, as to general deterrence, others will be deterred because Defendant's home confinement would simply be based on "unprecedented circumstances." Id. at 28.

Both before and after filing his motion for compassionate release with this Court, Defendant has also attempted to obtain compassionate release from the Bureau of Prisons. On May 8, 2020, the Bureau approved Defendant for release to home confinement on June 5, 2020.

3

See Doc. No. 280. The Court thus held Defendant's compassionate release motion in abeyance pending that release date. See Doc. No. 279. By June 8, 2020, the Bureau withdrew its release approval for Defendant. See Doc. No. 281, 282. While the precise reasons for this withdrawal are disputed, the litigants agree that Defendant initially did not sign documents that were necessary for his release to the halfway house. According to Defendant, he did not initially sign these documents because he wanted to speak with counsel and his case manager to "understand what was happening . . . with respect to the documents." Doc. No. 281 at 5. By contrast, the Government maintains that Defendant was actually "angry," informing prison staff "he would not sign [necessary] paperwork." Doc. No. 282 at 2. As a result, the prison removed him from the home confinement queue, reasoning that Defendant had "demonstrated his unwillingness to follow even the most basic rules, . . . [so] he was no longer a suitable candidate for home confinement." Id. at 3. In any event, as Defendant recognizes, the Court need not resolve these conflicting narratives to rule on this compassionate release motion. See Doc. No. 281 at 5.

The Government opposes Defendant's compassionate release motion before this Court. See Doc. Nos. 278, 282. To begin, the Government disagrees with Defendant that there are extraordinary and compelling reasons to support compassionate release. To begin, contrary to Defendant's assertions otherwise, "all staff [at FCI Edgefield] are temperature checked every day and wear bands indicating that they were temperature checked; staff are required to wear masks around inmates and other members; all areas, including common areas, showers, and living areas, are sanitized in bleach and a cleaning solution; and they have the ability to test on staff." Doc. No. 282 at 5. As a result, there have been few cases of COVID-19 at Edgefield. See id.[2] Thus,

---

[2] At the time the Government filed its briefs, there were no confirmed cases on COVID-19 at FCI Edgefield. See Doc. Nos. 278, 282. But two Bureau staff members tested positive for COVID-19 before the Court filed its Order. See Doc. No. 285; see also Federal Bureau of Prisons,

4

"Defendant fails to establish that he is more likely to contract COVID-19 while incarcerated at FCI Edgefield, which has [few] reported cases of COVID-19, than he would be in Charlotte, North Carolina, where" there are countless cases. Doc. No. 278 at 19.

Assuming there are extraordinary and compelling reasons, the Government next asserts that the § 3553(a) factors do not warrant release here. Specifically, "converting the remainder of Defendant's sentence to home confinement [would result] in him serving less than two years in custody for a $100 million fraudulent conspiracy which led to the demise of a publicly traded company, would result in a sentence that fails to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Id. Likewise, such home confinement "would result in unwarranted sentencing disparities" between Defendant and his co-defendant, Joanne Viard. Doc. No. 282 at 8.

## II. ANALYSIS

By its terms, 18 U.S.C. § 3582(c)(1)(A) permits the Court to reduce a term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction" and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." Relevant here, the Court "may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the Court determines that" (1) "extraordinary and compelling reasons warrant the reduction," (2) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13; see United States v. Chambliss, 948 F.3d 691, 693 (5th Cir. 2020).

---

*COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed June 26, 2020). These two cases do not change the Court's analysis, as FCI Edgefield still has very few confirmed cases.

Here, the Court has considered all the factors discussed by the litigants favoring and disfavoring release, including: the state of the COVID-19 pandemic—both generally and within FCI Edgefield—Defendant's criminal history, his disciplinary record and efforts to improve himself while imprisoned, his age and medical conditions, and his plan to return home to protect his health. The Court has also considered the fact that Defendant was convicted of a non-violent criminal offense. Still, on balance, the weight of the evidence and the § 3553(a) factors counsel against compassionate release at this time. As explained by the Government—and as expressly adopted here—Defendant has failed to present an extraordinary and compelling reason warranting a reduction. See Doc. Nos. 278 at 18–20, 282 at 5–12. And, even assuming Defendant has presented an extraordinary and compelling reason, the § 3553(a) factors counsel against compassionate release at this time, as providing Defendant with home confinement just two years into his term of custody for a fraudulent conspiracy causing about $95 million in losses would result in a sentence that fails to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. See Doc. Nos. 278 at 20, 282 at 8.[3] Thus, the Court declines to order compassionate release.

---

[3] While the Court incorporates the remainder of the Government's argument, the Court takes no position on whether Defendant's failure to sign release paperwork from the Bureau constituted a "lack of respect for the law" or otherwise militates against release under the § 3553(a) factors. Doc. No. 282 at 8. Regardless, the Court finds compassionate release is not warranted.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Compassionate Release, Doc. No. 276, is **DENIED.**

Signed: July 2, 2020

Max O. Cogburn Jr
United States District Judge